**Grady KLUTZ, Plaintiff,**

v.

**Messrs. BEAM and Tatum, agents and employees of the North Carolina Wildlife Resources Commission, Defendants.**

**Civ. No. 3011.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Argued June 22, 1973.

Decided Sept. 26, 1973.

George S. Daly, Jr., and Walter H. Bennett, Jr., Casey & Daly, P.A., Charlotte, N. C., for plaintiff.

Robert Morgan, Atty. Gen., Millard R. Rich, Jr., Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM OF DECISION FOR THREE-JUDGE COURT

Before CRAVEN, Circuit Judge, GORDON, Chief Judge, and McMILLAN, District Judge.

McMILLAN, District Judge.

Grady Klutz filed this suit seeking a declaration that the defendants unlawfully boarded and inspected his 46-foot boat, the "WAHOO," on Lake Norman, a sizeable inland lake near Charlotte, North Carolina, created by a Duke Power Company dam. He also seeks restraint against further boarding of vessels except pursuant to search warrant, and other relief, including counsel fees.

On Saturday, May 22, 1971, Grady Klutz and seven or eight guests were aboard Klutz's 46-foot motor launch, the "WAHOO." The defendants Beam and Tatum, wildlife protectors of the North Carolina Wildlife Commission, hailed the "WAHOO" and were allowed to come aboard by Robert Archer, who was at the helm. They had no warrant to search or inspect the "WAHOO." Klutz, the boat owner, of sterner and more truculent spirit, came out of the cabin, while the inspectors were still on the upper deck, and told the inspectors that they were not welcome and that they should get off the boat unless they were willing to remove their pistols and leave them in their own boat. Mr. Klutz, who had been drinking (without thereby violating any law as far as the record shows), was insistent and vehement in his objection to the visitation. The defendants Beam and Tatum remained aboard; they called for and examined the boat's registration papers; they examined the wheel house and upper deck; they checked the boat's bell and horn; they checked or had the opportunity to check the fire extinguishers, running lights, wheel and other navigational aids and equipment. Next, they "brushed past" Klutz (who moved aside without violence), and went below decks and into the cabin or bedroom where they counted the portable life preservers (one for each of the nine passengers). They then went further into the inner cabin, which contained no operating controls. The only claimed justification for this further forcible boudoir intrusion was to examine the head, or toilet, and see whether it met the statutory requirements. (It did.)

The defendants knew or had ample reason from previous observation to know that the "WAHOO" belonged to Klutz rather than the helmsman, Archer.

Both officers wore firearms which were visible when they hailed the "WAHOO" and when they came aboard. These firearms were part of a show of force to which Klutz yielded, although the objection originally raised by Klutz was insistently and volubly maintained throughout the ten or fifteen minutes that the defendants were aboard. Obviously, the initial welcome extended by the helmsman, Archer, had been canceled.

There was no evidence nor suspicion on the part of the defendants that the "WAHOO" or its occupants were violating the law.

No violations of law were found during the inspection.

There was no emergency which required that the boat be inspected without notice or warrant.

The defendants, a two-man team, testified that they board and inspect between 100 and 150 boats each Saturday and each Sunday, and that there are six or seven other two-man inspection teams who operate similarly on Lake Norman every weekend. Mr. Beam estimated that in the course of an average year he and Tatum issue probably 200 citations for violation of law. They work the lake seven days a week.

No record is kept of the findings of any inspection unless a citation is issued, and no record is made nor any certificate issued to show that the inspection had taken place.

Klutz testified that from mid-March to mid-September of that year the "WA-HOO" was his home; that his job was that of chief pilot for Cellu-Products Company; that he owns a home in Lincolnton, a few miles from the lake, and that from time to time he had to make trips and be away for estimated periods, but that of his time at home from March to September of 1971 he spent all but four or five nights on the "WA-HOO." He displayed his pilot's log in corroboration of his testimony.

Lake Norman is described as about 32,000 acres in size with a shoreline approaching 600 miles in length. It has between 30 and 35 marinas and numerous private docks. There were on the lake in 1971 around 260 boats with an indoor head or toilet.

Klutz likens the "WAHOO" to his home, mobile or otherwise, and asserts that the search was illegal, unjustified and unconstitutional, being unsupported by warrant, probable cause, or emergency.

Defendants liken the boat to an automobile and cite in their support decisions which have under their particular facts allowed warrantless searches of automobiles and seizures of articles found therein. Defendants also assert that their actions were authorized by Chapter 75A, § 17(a), of the General Statutes of North Carolina. Chapter 75A is entitled "Boating and Water Safety." It requires that on inland fishing waters boats with marine toilets shall contain prescribed sewage treatment devices or holding tanks; that vessels carry running lights as prescribed and be equipped with whistles, bells, life preservers or buoys, fire extinguishers and flame arrestors on carburetors, and methods of ventilating the bilges of engine and fuel tank compartments. The certificate of registration is required to be available for inspection.

Section 17(a) reads as follows:

"Every wildlife protector and every other law enforcement officer of this State and its subdivisions shall have the authority to enforce the provisions of this chapter and in the exercise thereof shall have authority to stop any vessel subject to this chapter; and, after having identified himself in his official capacity, shall have authority to board and inspect any vessel subject to this chapter."

Taken literally, Section 17(a) would extend an inspection authority that is absolutely unlimited as to time and place and convenience of occupants. It would authorize a search of every crevice of the boat to determine whether there might be hidden non-complying toilet facilities. It is carte blanche authority to every law enforcement officer of North Carolina to board any boat of any size at any time of any day and "inspect" to his full satisfaction. The statute contains no requirement of reasonableness and no effort to balance legitimate state interests against the boat-owner's right to be secure under the Fourth Amendment against unreasonable searches and seizures.

There was no suggestion of crime nor even a violation of any technical regulations in the operation of the boat or the behavior of its occupants. There was no warrant and no reasonable grounds to believe that a violation of the law was taking place. There was also no reason to believe that the owner in charge con-

sented to the search, because without physical violence he made it crystal clear that the inspectors were not welcome and that he wanted them to leave and that it was only the existence and show of force which persuaded him to step aside and allow them to invade his floating bedroom. Lake Norman is a sizeable lake, but it is landlocked at both ends and there has been no suggestion that like an automobile the 46-foot boat could have been spirited away or concealed before a warrant could have been obtained.

Is it so important that the state inspect the toilet facilities on private boats that the Fourth Amendment should be disregarded and the right of the owner to be secure against unreasonable searches and seizures should be abrogated?

The answer to that question must be "NO."

The power of a state to inspect boats for reasons of health and safety is not denied. The issue is the manner in which this inspection may constitutionally be conducted. Although the Supreme Court had held in 1959 that so called "administrative searches," to which the defendants would liken the instant search, did not fall within the ambit of the Warrant Clause of the Fourth Amendment, Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 the Court reversed itself eight years later in Camara v. Municipal Court of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930. In Camara the Court struck down a criminal prosecution of an individual who refused to consent to a warrantless inspection of his apartment for possible violation of a municipal housing code; such inspections were held to violate the Fourth Amendment unless based upon warrants issued upon showing of probable cause (with the criteria of "probable cause" being somewhat relaxed from those necessary to support issuance of a warrant in a criminal case). A companion case, See v. Seattle, 387 U.S. 541, 87 S.Ct. 47, 17 L.Ed.2d 51 (1967), applied the Camara principle to reach the same result in regard to a conviction for refusal to permit a warrantless inspection of commercial premises under the municipal fire code. In denying the validity of warrantless inspection, the Court emphasized not only the intrusion upon those inspected, but also, just as importantly, the existence of more reasonable, less oppressive methods than forcible entry as a means of safeguarding acknowledged public interest in maintenance of safe buildings and homes.

Recently the Court reaffirmed the principles behind the 1967 decisions in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), where it rejected the practice of the Border Patrol's stopping automobiles at will on public roads within twenty-five miles of the Mexican border as a means of carrying out its necessary task of preventing illegal immigration. However worthy the goal, the "unfettered discretion" given governmental officials was recognized as "precisely the evil the Court saw in Camara." 93 S.Ct., at 2538 (1973). Moreover, in a careful concurring opinion, Mr. Justice Powell noted that even in the border patrol situation there were feasible alternative procedures for the issuance of warrants; the border patrol was therefore not put to the Hobson's choice of either protecting the border by violating the Fourth Amendment, or of letting down the border guard to avoid violating the Amendment.

What Mr. Justice Powell recognized as a false dichotomy in Almeida-Sanchez is present to an even greater extent in the instant case, for it can not seriously be argued that the only way to protect the public interest in sanitary boats is by trampling on the safeguards of privacy and personal antonomy contained within the Fourth Amendment. As a practical matter, most people readily give consent to such inspections; for those who do object, as in this case, the warrant route can easily be followed, especially

since the state need show, not full-scale probable cause to search the specific boat in question, but only that the presence on the lake of boats like plaintiff's boat, or the size and nature of the lake, raise problems which justify the inspection searches. "The use of an area warrant procedure would surely not 'frustrate the governmental purpose behind the search.' Camara v. Municipal Court, *supra*, 387 U.S., at 533. It would of course entail some inconvenience, but inconvenience alone has never been thought to be an adequate reason for abrogating the warrant requirement. *E. g.*, United States v. United States District Court, *supra*, 407 U.S. [297,] at 321 [, 92 S.Ct. 2125, 32 L.Ed.2d 752.]" Almeida-Sanchez v. United States, 93 S.Ct. at 2544–2545 (1973) (Mr. Justice Powell, concurring).

Furthermore, *Almeida-Sanchez* disposes of the state's contentions that such inspections are supported by the decisions in United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (warrantless inspection of premises used in selling firearms) and Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (warrantless inspection of premises of a dealer of alcoholic beverages). What the Court stated in *Almeida-Sanchez* applies equally to the instant case:

> "A central difference between those cases and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him." 93 S.Ct., at 2538.

Even without warrants, the state could reasonably establish a procedure similar to that involving motor vehicles, requiring periodic inspection of safety and sanitation features with the posting of a sticker showing compliance with such inspection at a recorded time, and the state could make it unlawful to operate a boat without such a duly issued and current sticker appropriately displayed. However, possible emergencies aside, warrantless searches against the owner's will of a boat on a land-locked lake, which can be repeated, willy-nilly, by that inspector or any other inspector who chooses to board the boat, is an oppressive and unreasonable—and unconstitutional—burden not justified by the considerations of sanitation and safety advanced by the state.

We need not decide whether travel on a lake is a "right" or a "privilege" (even assuming that distinction has meaning) in order to agree that it is scarcely the kind of "special perquisite" present in *Colonnade* or *Biswell*. See *Almeida-Sanchez*, 93 S.Ct., at 2543 (Mr. Justice Powell, concurring). Private boats and automobiles, like private houses, have those "expectation[s] of protected privacy," Couch v. United States, 409 U.S. 322, 336, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), about them which require traditional Fourth Amendment protections rather than the less strenuous standards in cases of public and "pervasively regulated business[es]," Biswell v. United States, 406 U.S., at 316, like dealerships in firearms and intoxicants. The public interest in automobile and boat safety and in boat and lake sanitation can and should be satisfied within the protections of the Fourth Amendment.

Counsel for plaintiff will tender an appropriate judgment.