Joseph J aspan, J.
The defendants, accused of grand larceny and possession of stolen property, move to suppress physical property seized at the time of their arrest. They claim that the police, under the guise of a routine administrative inquiry, actually conducted a warrantless and illegal search.
At issue is the nature of the intrusion, the character of the premises, and the constitutional limits of police inquiry and inspection of a licensed business.
FINDINGS OF FACT
At 9:30 a.m. on August 30, 1973, a business day, a sergeant and four police officers visited a junkyard at 5851 Foster Avenue, Brooklyn for the announced purpose of inspecting a "police book” which the licensed dealer was required to maintain on the premises in accordance with the provisions of articles 18 and 19 of title B of chapter 32 of the Administrative Code of the City of New York. In this book the dealer was required to record the date and nature of each purchase and sale and the name and address of each purchaser and seller. The obvious purpose for such a record is to discourage the purchase of stolen property.
Despite a claim that it was a routine inspection, the visit was actually scheduled to check out a tip and previous confirming observations that the operators were receiving and scrapping cars which they were not lawfully entitled to possess.
The junkyard is an open area approximately 200 feet by 800 feet, surrounded by a 10-foot high chain-link fence with a tin *143 interlining screening the contents and the operations from street view. An open gate provides public access to the premises. Inside the gate is a shed 15 feet by 20 feet constituting an office at which a customer is advised by a sign to check in before proceeding any further into the yard. The office is not always attended, no barrier restricts further entry to or impedes a view of the entire premises, and it has not been established that the admonition to "check in” was regularly enforced.
When the police arrived on the morning of August 30, the premises were open for business. They entered through the gate, stopped near the office five feet inside, and shortly thereafter the defendant Hugh Colton approached from within the yard and identified himself as the employee in charge. When the police asked to look at the "police book”, Colton said he would have to call his boss, now identified as the defendant Nunzio Ruggieri. Colton entered the shed to call Ruggieri and was not successful in reaching him immediately. Ruggieri arrived at the yard some two hours later and stated that he did not have the required "police book” alleging that it had been stolen in a burglary. The other evidence convinces me the defendant did not maintain the required record book.
Shortly after their arrival, the police began to roam in a limited area not in excess of 12 feet from the shed, looking at the automobile parts spread about them. One officer noticed some transmissions which appeared to have their vehicle identification numbers (VIN’s) eradicated, ball-peened out. Outside the shed the police also noticed and examined several racks of auto doors and observed that 80 to 90% of the doors had their pollution stickers containing VIN’s removed. The police then went into the shed and saw motors, and again noticed obliteration of the VIN’s. The motors were not concealed behind any door or obstructed by any barrier, but were moved from under a table for closer observation.
In two cases where the numbers could be raised and deciphered, the police established that the parts were from cars reported to be stolen.
After all these events and at about 1:30 p.m., the police seized five transmissions, four motors and four car doors and arrested each of the defendants, charging them with possession of altered vehicle identification numbers (Penal Law, § 170.70), which later ripened into the current indictment.
*144 CONCLUSIONS OF LAW
The few available cases on the issue of administrative searches reflect a noticeable trend which can be extended into a determination of the legal issues presented by the foregoing facts.
In Camara v Municipal Ct. (387 US 523), the court, by a 6-3 vote, held that an administrative search without a warrant of a private home by municipal health and safety inspectors was an unauthorized intrusion not justified by the competing public and private interests.
See v City of Seattle (387 US 541), decided the same day, held that the city did not have the right to enter a locked commercial warehouse without a warrant and without probable cause to believe that a violation of any municipal ordinance existed. The majority opinion (again 6-3) held as follows (p 545-546): "We therefore conclude that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure. We do not imply that business premises may not reasonably be inspected in many more situations than private homes” (italics supplied).
The court in See acknowledged licensing programs may dictate a review on a case-by-case basis under the Fourth Amendment standard of reasonableness.
In Matter of Finn’s Liq. Shop v State Liq. Auth. (24 NY2d 647, 654), the Court of Appeals, in 1969, quoted See as authority for the proposition that Fourth Amendment protections do not apply to those portions of a business open to the public.
The Supreme Court was asked in 1970 to rule on the reasonableness of a forcible search of a locked room maintained by a liquor licensee (Colonnade Corp. v United States (397 US 72). The court held (p 77) that the "Nation’s traditions * * * are strongly opposed to using force without definite authority to break down doors.” But this case did not turn upon an alleged constitutional violation but upon a failure of the licensing statutes to authorize such action. Mr. Chief Justice Burger noted in his dissent (p 78), "The majority sees no constitutional violation; I agree.”
In United States v Biswell (406 US 311), the court, applying the case-by-case tests referred to in See, held that a warrant-less search of a gun dealer’s locked storeroom during business *145 hours as part of an inspection procedure authorized by statute, during which unlicensed firearms were seized, did not violate the Fourth Amendment.
The majority (8-1) noted (p 314) that the search was not accompanied by any "unauthorized force,” that (p 317) enforcement of the gun control law was a matter of "urgent federal interest,” and that (p 317) the "threat to privacy * * * [was] not of impressive dimensions” (italics supplied).
The distinction between a search of a house and that of a licensed business was underscored in People v Rizzo (47 AD2d 468, 472) where the court said: "The fact that the state intruded upon Rizzo in his home where justifiable expectations of privacy are particularly strong, mandates that at the very least, any statutory authorization for such warrantless entry be quite clearly and carefully defined [italics supplied]”.
In essence, the appellate courts have now sustained searches of licensed commercial enterprises while open for business, provided the statutes authorized such inspection, and even in the absence of such a specific authorization, searches of those business areas open to the public.
Tested against those principles, the search of this licensed junkyard must be sustained.
The traffic in stolen automobiles and their component parts is a concern of society and the proper subject for regulation. Article 18 of title B of chapter 32 of the Administrative Code of the City of New York makes it unlawful to act as a junk dealer without a license, and article 19 of the same title requires a license to deal in second-hand articles.
While neither statute specifically authorizes inspection of the premises, they do authorize entry upon the premises to inspect the "record of purchases” which must be maintained (Administrative Code, §§ B32-123.0, B32-132.0), an intrusion which gives effect to the purpose of the licensing provisions.
The entry here was not a random intrusion, but rather a response to a well-founded suspicion that operations at the yard were in violation of law. The request to see the "police book” was in aid of the investigation and specifically authorized by statute.
The defendants argue with some merit that the presence of so many police officers was dictated by a plan to search the premises and was not intended to provide the necessary manpower to look at one book. And yet the evidence clearly *146 shows that notwithstanding the fact that the owner did not keep the required records, the officers did not at any time engage in any exploratory search of the premises. The property examined and seized was either in the shed or within 12 feet of it, in open view from the vantage of the shed. A search of the 160,000 square foot yard would have involved a far more extensive area than that which was explored.
The defendants then say that the police should not have left the immediate vicinity of the door to the shed and that any movement away from that area constituted a search. But there were no barriers in the general area of the shed and it could hardly be expected that invitees or licensees waiting for any period of time would be limited to a position roughly described as a hitching post.
The premises were open for business and were accessible to the public. A sign which requested patrons to check in at the office was a procedural limitation not affecting the ultimate right of a customer to move more freely about the premises in aid of a purchase or possibly a sale. Indeed, the open display of goods was an invitation to examine them.
The public area must be measured by the standards applied to invitees to a place of business.
An invitee must confine himself to such parts of the premises as are included within an express or implied invitation and may not without further invitation go to out-of-the-way places on the premises wholly disconnected from and in no way pertaining to the business in hand (65 CJS, Negligence, § 63[50], p 750). But the invitation extends to those parts of the premises which are so arranged as to lead an invitee reasonably to think that they are open to him (65 CJS, Negligence, p 752).
The shed and the area immediately surrounding were within the scope of an invitee’s attention. Accordingly, it was a place open for business and police inquiry so limited did not constitute any intrusion upon the privacy of the corporate owner of the junkyard or its management personnel.
The observations made by the police of objects in open view within the area open to the public did not constitute such an intrusion as would violate the principles, of law enunciated in Camara, See, Colonnade or Biswell (supra).
"Where the initial intrusion that brings the police within plain view of * * * an article is supported, not by a warrant, *147 but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.” (Coolidge v New Hampshire, 403 US 443, 465.)
The police could not, indeed they should not, close their eyes to what is evident to their trained eyes. They suspected crime and found probable cause to believe it had been committed. Accordingly, they could seize and arrest.
The motion to suppress the physical property is denied.