M. Marvin Berger, J.
Defendant corporation owns two brownstone apartment dwellings in the West 80’s of Manhattan. The issues in question affect one of the houses, 45 West 80th Street, but may also affect the other, 157 West 80th Street. Both houses were converted to multiple occupancy.
The defendant corporation, whose principal stockholder, Stanley E. Kooper, is a lawyer, moves to suppress evidence obtained by New York City Housing Inspector, Leonard Saccheri. In January and February, 1969, Inspector Saccheri made three separate inspections of 45 West 89th Street, leading to his charging defendant with violations of the Administrative Code of the City of New York and the Multiple Dwelling Law. ■
Mr. Kooper is not an occupant of the building.
The motion was supported by the testimony of three witnesses called by the defendant. The prosecution called the inspector as its sole witness.
The issue defined in the defendant’s motion papers, and amplified in its brief, is whether the searches violated the defendant’s rights, under the Fourth Amendment to the United States Constitution, to be free of a warrantless search of the premises, designed to uncover violations of the code and the Multiple Dwelling Law, in the face of warnings against and objections to such procedure by Mr. Kooper.
According to the Assistant Corporation Counsel who appeared in opposition to the motion, the instant application is the first such motion to be supported by testimony.
Preliminarily, we face the question as to whether a motion to suppress the inspector’s observations is procedurally appropriate. In the leading New York case on the subject of administrative search People v. Laverne (14 N Y 2d 304), the Court of Appeals rejected the People’s argument, that the defendant, in seeking to suppress prosecution testimony given during trial concerning the defendant’s violation of a village zoning ordinance, had failed to comply with the requirements of section 813-d of the Code of Criminal Procedure.
Writing for the majority of the court, Judge Bergan said (supra, pp. 309-310): “ The full sense of title II-B [of the Code of Criminal Procedure] is to provide a means of suppressing *695 as evidence or restoring to the owner tangible evidence unlawfully seized.
1 ‘ A statute such as this should not be applied literally to what a witness has observed, carries in his memory, and will some day in court articulate into a narrative in words. This is not material for suppression in the way physical things which are held as evidence may be treated. The normal way to protect a defendant’s rights from the narrative of things learned by an unlawful search is not to take the testimony of the witness on objection when it is actually offered. (Cf. People v. O’Neill, 11 N Y 2d 148, 153-154.) ”
Sections 813-c, 813-d and 813-e of the code were enacted in 1962, following the United States Supreme Court’s landmark ruling in Mapp v. Ohio (367 U. S. 643 [1961]) which applied to the States the exclusionary rule prohibiting use of illegally seized evidence.
In People v. Mitchell (41 Misc 2d 839 [1963]) Justice Sabafite wrote:‘ ‘ While section 813-c of the Code of Criminal Procedure provides for pretrial motions to suppress evidence allegedly obtained as the result of an illegal search and seizure, it does not authorize the present application. This section may not be used as a device to obtain, in advance of trial, rulings on the admissibility of evidence not obtained by search or seizure.”
And in People v. Gerber (43 Misc 2d 724 [1964]), which antedated enactment of title II-C of the code, governing admissibility of confessions, Judge Obmand N. Gale held that the methods set forth in the Code of Criminal Procedure, relative to suppression of tangible evidence, were inapplicable to confessions where no tangible evidence was involved.
However, rather than denying the motion on procedural grounds, the court prefers to deal with issue on the merits, both for the guidance of the trial court, in the event that it is sought to exclude the inspector’s testimony on trial, and perhaps for the precedental value of a ruling on this question.
Summarizing the testimony heard on the motion, Inspector Saccheri testified that he had gained entry on his first visit to the premises in January, 1969 by ringing a doorbell on the outside of the house. He was admitted by a tenant, Mrs. Salkind, who despite some misgivings, which led her to telephone Mr. Hooper’s office to report the inspector’s visit, permitted him to view her apartment. Her daughter, who occupied another apartment in the building, likewise, admitted Saccheri into her apartment.
In the course of Mrs. Salkind’s telephone call to Mr. Hooper’s office, the inspector spoke to Gertrude Borack, Hooper’s secre *696 tary. Later that day he spoke to Mr. Kooper who expressed strong objection to the inspector’s entry and told him that he could make no further inspections unless he first obtained a search warrant.
Nevertheless, Inspector Saccheri persevered. He was admitted to the house on two later occasions by the expedient of ringing the outer doorbell and being admitted by tenants. Thus, he testified, he was enabled to visit every apartment, presumably without objection from the tenants. Obviously, he also saw the portions of the building common to all the tenants, such as stairways and halls.
The inspector’s interest in the building was strong enough to survive several visits in the course of which he was unable to get an answer to his doorbell ringing. He testified that he was concerned to discover possible violations resulting from a change in the city’s sanitary code (Health Code) requiring a water eloset and bath for every six persons occupying brownstone dwellings converted to single-room occupancy.
The record does not disclose that the observations leading to the filing of the charges covered premises occupied by the tenants who admitted the inspector to premises common to all tenants. Nevertheless it is clear that the inspector gained access to the premises without the use of force, as a result of the explicit or implied consent of the tenants, despite the owner’s objections.
We are not faced here with an attempt to enforce section D26-52.03 of the Administrative Code, or section 649 of the City Charter, which penalize by fine and imprisonment, the refusal to permit an inspector to enter and inspect a building. The court would be constrained to acquit the defendant of such a charge in the light of the decisions of the Hnited States Supreme Court in Camara v. Municipal Ct. (387 U. S. 523) and See v. City of Seattle (387 U. S. 541), both decided in 1967.
Camara struck down a provision of the San Francisco Housing Code punishing resistance to a demand for entry by a city building inspector. The Supreme Court 'by a 6 to 3 vote held that the Fourth Amendment barred prosecution of the defendant for refusing to permit such an inspection.
See (supra) held the same principle to be applicable to a routine administrative inspection of commercial premises. The court stated {supra, p. 546): “ We hold only that the basic component of a reasonable search under the Fourth Amendment— that it not be enforced without a suitable warrant procedure— is applicable in this context, as in others, to business as well as to residential premises.”
*697 The ruling in People v. Laverne (14 N Y 2d 304, supra) arose from a prosecution for violation of a village ordinance forbidding use of a residence for business purposes. The inspections were resisted personally by the owner on three separate occasions. The court said (supra, p. 308) “ we are of opinion that the searches by the public officers of defendant’s home without warrants for the purpose of criminal prosecutions were to that extent in violation of his constitutional rights.”
In the instant case it appears that the entry, while without the owner’s consent, was made with the acquiescence of the tenants, who had rights coeval with the landlord’s in respect to the premises leased by them or to which they shared common access.
The principle has been thoroughly established that, where two persons have equal rights to use or occupancy of premises, either may give consent to a search. As stated in People v. Mosley (26 A D 2d 668, 669 [1966]): “It has consistently been held that consent to a search may be operably given by a person other than the defendant, if that person occupies the premises or vehicle searched or has possession of the property seized, and the evidence thus obtained is admissible against either defendant (People v. Matthews, 21 A D 2d 883; People v. Kortwright, 236 N. Y. S. 2d 385).”
To the same effect are United States v. Sferas (210 F. 2d 69), Driskill v. United States (281 F. 146), People v. Schwartz (54 Misc 2d 34) and People v. Hailstock (54 Misc 2d 952).
In the recent case of People v. Taddeo (62 Misc 2d 833, 836) Judge Gale affirmed conviction of the defendant by the City Court of Syracuse for violation of the city’s housing code. The inspector had been admitted on the premises by the tenant in possession of the building. The defendant landlord urged that the Camara holding required his acquittal since he had objected to the search. Judge Gale wrote: “ At the outset the Camara case is clearly distinguishable in that a tenant who had refused consent to a search of his premises thus subjected himself under the code in question to possible fine and imprisonment. It is vital to our decision that the tenant, residing at 118 Kirk Avenue, City of Syracuse, did not in fact refuse admittance to the inspectors.”
Despite the propriety of the search in the instant case, the court must take note of the inadequacy of criminal sanctions for the enforcement of administrative codes. As stated by Gribetz and Grad, Housing Code Enforcement: Sanctions and Remedies (66 Col. L. Rev. 1254, 1276 [1966]): “ The trouble with criminal *698 prosecution for housing violations — as well as for the scores of other state and local regulations of health and safety — is that in hard-core cases it does not work. The remedy is inadequate as a cure or deterrent; it does not result in repairs of buildings or in deterrence of recalcitrant owners. Furthermore, the sanction is fraught with procedural and conceptual difficulties that make it unsuitable as a contemporary code enforcement device.”
The Camara opinion (supra), rendered a year after publication of the Gribetz & Grad article, underscores the problems inherent in applying criminal procedures to enforce administrative codes.
But even assuming that adherence to such due process requirement as that mandated by Camara would not be as troublesome to the agency seeking code compliance as had been feared by the dissenters in that case (see La Fave, Administrative Searches and the Fourth Amendment, 1967 Sup. Ct. Bev. 1), it approaches the use of “ a sledge-hammer with which to crack a nut ” (Waters, Bights of Entry in Administrative Officers, 27 Univ. Chicago L. Bev. 79, 92 [1959]).
But another potent argument against the inappropriateness of criminal sanctions to enforce administrative codes continues to be raised. That argument is concerned with the overcrowding of the criminal courts.
As was aptly stated by the former Presiding Justice of the Appellate Division, First Department, Bernard Boteen, in his introduction to the Thomas M. Cooley Lectures of 1970 (N. Y. L. J., Oct. 29, 1970, p. 4, col. 2) “ The criminal law is overextended. The heavy reliance upon it to enforce a wide variety of society’s norms, besides adversely affecting the worthing of the system, presupposes a deterrent and rehabilitative power which in many instances simply does not exist.” Among the kinds of cases which former Justice Botein urges eliminating from the criminal justice system are housing violations.
Also, Benjamin Altman, New York City Commissioner of Bent and Housing Maintenance, in a recent, article describing the housing code enforcement function of the City’s Housing and Development Administration, said: (N. Y. L. J., Oct. 28, 1970, p. 4, col. 1) “ Once voluntary compliance fails, code enforcement of the Multiple Dwelling Law and Housing Maintenance Code has been criminal prosecutions. The huge number of cases — in excess of 30,000 annually — adds to the burdens on the Criminal Courts, seemingly eliminating the possibility of proper evaluation of housing cases. Too often violators receive inconsistent treatment, with a penalty system unrelated to achieving compliance. Delay is such that 58 per cent of Hous *699 ing" Code Criminal Court prosecution appears in court seventeen months after the violation is first placed.
“ A bill to be reintroduced in the 1971 state legislative session would authorize the city to use administrative proceedings to impose penalties of persons responsible for code violations, whether they be landlord or tenant * * # Our intent is to
remove code enforcement from the Criminal Court and place it in a setting that will more realistically deal with obtaining compliance; punishment is not our end. Housing maintenance, the correction of violations is our goal.”
The motion to suppress is denied and defendant will stand trial.