OPINION OF THE COURT
Michael D. Stallman, J.
Defendant moves to dismiss 12 separate actions which charge him with penal offenses under the New York City Building Code (Code) (Administrative Code of City of New York § 27-101 et seq.). The motions raise significant jurisdictional questions which this court must resolve, and disturbing policy questions which this court cannot resolve.
PROCEDURAL HISTORY
Defendant is charged with untitled offenses which punish noncompliance with Code requirements after notice. (Administrative Code §§ C26-85.5, C26-86.5 [a], recodified as §§ 26-246, 26-248 [a]; § 26-248 [d]; § 26-125.)[1] Each docket alleges that defendant did not comply with elevator maintenance requirements in two residential buildings. (Administrative Code §§ C26-105.1, C26-105.2 [now §§ 27-127, 27-128]; Building Code Reference Standard RS 18-1.) Defendant apparently owns one building, and controls the other as the sole shareholder of its corporate owner.
Each docket contains a Buildings Department form letter *234 bearing a checklist of Code violations,[2] and a warning to correct the marked items within 10 days on penalty of being "summoned to appear in the Criminal Court.” Each letter bears stamped signatures of the commissioner and borough superintendent and an entry, "filed by [usually illegible].” There is no indication of who actually prepared it, or whether it was based on personal inspection, departmental records or a received complaint. The actual occurrence date of the administrative violations thus cannot be determined. The city claims, and defendant disputes, that the 12 letters were mailed to the defendant over a five-year period beginning in 1981. No proof of service or evidence of mailing has been offered.
The city apparently did nothing until December 1984, when it brought three criminal actions based on violation letters issued in 1982, 1983 and 1984. The other 9 matters, including 5 from 1981, were allowed to lie fallow until 1987.
The city initiated each action by issuing what appears to be a parking ticket form. Defendant concedes that he received three parking tickets in the mail[3] at his office, on or about *235 December 20, 1984. Each ticket listed only the underlying Code sections, which simply state an owner’s responsibility to maintain the building and keep service equipment in working order. (Administrative Code §§ C26-105.1, C26-105.2 [now §§ 27-127, 27-128].) Curiously, no ticket listed any criminal violation, much less the penal sections charged in the informations filed[4] to commence each action. (Administrative Code §§ C26-85.5, C26-86.5 [a].) The tickets were returnable in court on January 28, 1985. Warrants were issued when the defendant did not appear.
While these warrants were outstanding, the city mailed defendant nine other such tickets on or about July 6, 1987 returnable on August 10, 1987. Defendant concedes mailing and receipt. These tickets also listed as violations the underlying Code sections, but not the penal sections charged in the contemporaneously filed informations. Again, warrants were issued when defendant did not appear on the return date. All 12 warrants remained outstanding until May 26, 1988, when defendant surrendered pursuant to the city’s request, and was arraigned on the 12 dockets. The city answered ready on August 15,1988.
All cases were repeatedly adjourned, on consent and without explanation, for nearly a year. Protracted motion practice ensued. After oral argument of one set of motions to dismiss, but without seeking leave to amend, the city filed new instruments alleging section 26-125 on all dockets, and section 26-248 (d) on the 1987 dockets; defendant again moved to dismiss.[5]
*236 I. PERSONAL JURISDICTION
Defendant asserts that this court lacks jurisdiction over the defendant’s person, claiming that the city had no authority to issue the tickets, which he characterizes as "summonses.” The city, however, classifies them as appearance tickets.
A. Taxonomy. The subject documents plainly bear the word "summons,” or, depending on the variant of the form used, "complaint/information”.[6] Directly beneath is printed either "Notice of Violation” or "Copy of Notice of Violation.” Like other antiquated city forms still in use which purport to be summonses (e.g., the "universal summonses” used by the police to charge petty offenses), the tickets in question are not summonses. The title of a form is not dispositive. (CPL 150.10; see, Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 150.10, at 394.) Nevertheless, some courts have assumed that a document is a summons simply because it purports to be one. (See, e.g., People v MacFarlene Co., 130 Misc 2d 70 [Crim Ct, NY County]; People v Durch, 140 Misc 2d 353 [Crim Ct, Kings County].)
A summons is a process issued by a local criminal court. It commands a person accused of an offense by an information or a complaint previously filed with the court to appear at a specified time for arraignment on the charges. (CPL 130.10 [1].) In contrast, an appearance ticket is defined as "a written notice issued and subscribed by a police officer or other public servant authorized by state or local law enacted pursuant to the provisions of the municipal home rule law to issue the same, directing a designated person to appear in a designated local criminal court at a designated future time in connection with his alleged commission of a designated offense. A notice conforming to such definition constitutes an appearance ticket regardless of whether it is referred to in some other provision of law as a summons or by any other name or title.” (CPL 150.10.) Each of the tickets was issued, not by a court, but by an elevator inspector. Although it directed defendant to ap *237 pear on a return date in Criminal Court,[7] no information had yet been filed charging him with an offense.
While each ticket contains most data required of an appearance ticket, it is deficient in the most important respect: it fails to give fair notice. Its misleading appearance and contradictory wording (e.g., instructions on some forms for paying a penalty by mail) do not adequately convey that the city is bringing a criminal action.[8] It undermines the purpose of appearance tickets: encouraging voluntary appearance and avoiding unnecessary arrests. Under circumstances not present here, it could cause injustice amounting to a due process violation. Nevertheless, classification of the subject tickets is not material to this court’s determination. (See, part I [C], infra.)
B. Authority to Issue the Tickets. The Municipal Home Rule Law specifically enables local legislative bodies to authorize the issuance of appearance tickets to enforce safety provisions *238 of local laws. (Municipal Home Rule Law § 10 [4] [a].) It also enables the local legislature to empower such issuance "by a public servant who, by virtue of office, title or position is authorized or required to enforce any such statute, local law, ordinance, rule or regulation relating to parking, licensing of occupations or business, fire prevention and safety, health and sanitation, and building, zoning and planning”. (Municipal Home Rule Law § 10 [4] [a]; see, in accord, CPL 150.20 [3].) The City Council was thereby empowered to enact the Administrative Code provisions providing for the issuance of "notices” and their service by "any officer or employee of the department, or by any person authorized by the superintendent.” (Administrative Code §26-244 [c] [a], formerly § C26-84.5 [c] [a].)
The Administrative Code, in this respect, as in many others, is not a model of clarity. The cited section refers to "all notices or orders required or authorized * * * directing anything to be done” (Administrative Code § 26-244 [a]), it does not specifically mention appearance tickets. This is not surprising, since it predates the Criminal Procedure Law’s invention of the appearance ticket. Contextually, however, the section’s language may well embrace appearance tickets; read together with the Code’s penal provisions, it inferentially contemplates the use of a departmental notice to initiate a criminal action.[9]
C. Service by Mail. Defendant further argues that, even if the tickets were deemed appearance tickets, service by mail would have been improper. Defendant cites CPL 150.40 (2), which provides that "[a]n appearance ticket, other than one issued for a traffic infraction relating to parking, must be served personally.” The city, however, cites Administrative Code § 26-244 (c), which provides for service of departmentally issued notices by mail.[10]
*239 In a criminal action, unlike a civil action, the court’s exercise of jurisdiction does not depend on proper service of process. All that is required is that the defendant come, or be brought, before the court for arraignment. (See, People v Haber, 20 Misc 2d 272 [Ct Spec Sess, Appeal Pt, 2d Dept]; People v Sessa, 43 Misc 2d 24, 26 [Crim Ct, NY County]; People v Byfield, 131 Misc 2d 884 [Crim Ct, NY County].)
Proper service is vital to a civil action. It not only gives a defendant constitutionally adequate notice (see, Mullane v Central Hanover Bank & Trust Co., 339 US 306), it is a symbolic exercise of State power. (Matter of Bonesteel, 16 AD2d 324 [3d Dept]; see, City of New York v Chemical Bank, 122 Misc 2d 104 [Sup Ct, NY County].) It conveys that a private party is invoking the sovereign’s power to redress what is essentially a private wrong. If the defendant fails to appear, proof of proper service can be used, inter alia, to enter a default judgment. Actual notice alone is insufficient. Unless service is made in the statutorily required manner, the court cannot subject the defendant to its jurisdiction without his consent.
Such ritual is not required in a criminal case. A criminal defendant is accused of perpetrating a public wrong and can be brought summarily before the court, without prior notice, by arrest. Since default judgments are ordinarily unavailable in criminal cases (cf, CPL 600.20 [permitting defaults to be entered against nonappearing corporations]), a defendant’s physical presence is required for the court to exercise personal jurisdiction. How that presence is obtained is immaterial.
An appearance ticket is simply a statutory alternative to arrest. It affords an appropriate defendant advance notice, enabling him to appear in court voluntarily in a noncustodial setting. (See, Bellacosa, Practice Commentary, McKinney’s *240 Cons Laws of NY, Book 11A, CPL 150.10, at 393.) Upon nonappearance, the court is empowered to issue an arrest warrant to forcibly bring the defendant before it. (CPL 150.60.) When a defendant’s whereabouts are unknown, making an appearance ticket impracticable, a court is empowered to issue an arrest warrant. (CPL 120.10 et seq.) Since the issuance of an appearance ticket is not a jurisdictional prerequisite, a fortiori, the method of service cannot be considered one.[11] When defendant finally appeared for arraignment, he did so voluntarily. He thereby submitted to this court’s jurisdiction.
II. SUBJECT MATTER JURISDICTION
Defendant urges dismissal for lack of subject matter jurisdiction, arguing that the allegations assert only nonpenal violations actionable exclusively in courts of civil jurisdiction. The People contend that subject matter jurisdiction was acquired over each action when the information was filed.
Historically, it has been assumed, without analysis, that the Criminal Court and its predecessors had subject matter jurisdiction over Code violations. This assumption is based on another, viz., that subject matter jurisdiction is conferred on a criminal court merely by the filing of an accusatory instrument. (See, e.g., People v Grant, 16 NY2d 722; People v Rodman, 65 Misc 2d 123 [Crim Ct, NY County], revd on other grounds 71 Misc 2d 352 [App Term, 1st Dept], affd 32 NY2d 821; People v MacFarlene Co., 130 Misc 2d 70 [Crim Ct, NY County], supra; 1987 Procedure Manual for Judges, Criminal Court of the City of New York, Office of Ct Admin 1987, at 1.) Routinely quoted and hoary, this cliche is conceptually unsound. Indeed, it begs the question.
Subject matter jurisdiction denotes the competence of a specific court to entertain particular types of litigation. (Gager v White, 53 NY2d 475.) A court derives its subject matter jurisdiction from the sovereign it serves, by constitutional or *241 statutory grant. Unless the subject category of litigation and the remedy sought are embraced by the jurisdiction so conferred, any judgment is void ab initio. Lack of subject matter jurisdiction is a fatal defect, not curable by waiver, consent, estoppel or laches. (See generally, Siegel, NY Prac § 8.) Litigants cannot confer subject matter jurisdiction. Filing an accusatory instrument cannot confer subject matter jurisdiction on a criminal court that has not been authorized to adjudicate the offense charged. To hold otherwise would permit a prosecutor to unilaterally expand a court’s authority.
An accusatory instrument gives the defendant notice of the offense charged and binds the prosecution to the allegations it must prove. It is a necessary correlate to the rights to due process, fair trial and confrontation. Thus, it would be constitutionally impermissible for a court to use its power in the absence of a properly filed, legally sufficient accusatory instrument. The failure to file a proper accusatory instrument has been held unwaivable; consequently, it is deemed a fatal “jurisdictional defect.” (See, People v Hall, 48 NY2d 927; People v Phillipe, 142 Misc 2d 574 [Crim Ct, Kings County].) To say that a court has not acquired subject matter jurisdiction because the prosecutor has failed to file a proper instrument, or that its jurisdiction is divested because the instrument is legally insufficient, is a non sequitur.
The Criminal Court was established by the Legislature, and granted subject matter jurisdiction pursuant to constitutional authority, over inter alia, trials of misdemeanors and offenses of a grade less than misdemeanor.[12] (NY Const, art VI, § 15; NY City Crim Ct Act § 31.) If the instant charges are nonpenal administrative violations, civil in nature, as defendant contends, this court would lack subject matter jurisdiction. If, *242 however, they are misdemeanors or petty offenses under the criminal law, this court would be an appropriate forum.
Defendant argues that section 26-246 (c), which grants jurisdiction over suits and proceedings under the Building Construction Code to "all courts of civil jurisdiction in the city,” is a grant of exclusive jurisdiction. In the alternative, defendant contends that section 26-248 (a) contemplates only a civil remedy since only section 26-248 (d) and (g) expressly mandate criminal penalties.
Section 26-246, "Judicial remedies”, authorizes the corporation counsel to institute "any appropriate action or proceeding at law or inequity to restrain, correct or remove” (subd [a]) a Code violation pertaining to construction or maintenance. It further provides that any person who maintains or continues a violation, after having been duly notified of the violation, "shall be subject to any action or proceeding and any punishment that is provided for in this article [article 9] for the commission of the violation”. (Administrative Code § 26-246 [a].) Five specified categories of violation, not pertaining to elevator maintenance, are made punishable without prior notification. Contextually, both civil and criminal remedies are contemplated. Section 26-125 (a), which incorporates section 26-248 by reference, explicitly provides: "every person who shall violate any of the provisions of any laws, rules or regulations enforceable by the department or who shall knowingly take part or assist in any such violation shall he guilty of an offense and upon conviction thereof shall be punishable by a fine of not more than five thousand dollars. Such persons shall also be subject to the payment of a penalty of not more than five thousand dollars to be recovered in a civil action brought in the name of the city” (emphasis added). "Offense”, "conviction”, "punishment” and "fine”, individually and collectively, are words of art presuming criminal prosecution. Since the Code contemplates parallel criminal and civil proceedings, and since the Civil Court lacks criminal jurisdiction, section 26-246 (c) cannot be read restrictively as defendant seeks. Rather, it was intended as a grant of broad jurisdiction to the Civil Court over the civil remedies specified. The Code does not specifically grant criminal jurisdiction or denote any court as the forum for prosecution; such a grant would have been unnecessary. Since section 26-248 (a) constitutes a nonfelony penal offense, a prosecution must be brought in the Criminal Court. Accordingly, this court has subject matter jurisdiction over the actions at bar.
*243 III. CLASSIFICATION OF OFFENSES
The city claims that section 26-248 (a), charged in the original informations, is a misdemeanor. The city assumes that section 26-248 (d), charged in the superceding informations filed on the 1987 dockets, is a misdemeanor. Defendant argues that all charges, if deemed penal, are only violations.
Penal Law § 55.10 (3) provides in pertinent part:
"Violations * * *. Any offense defined outside this chapter [i.e., the Penal Law] which is not expressly designated a violation shall be deemed a violation if:
"(a) Notwithstanding any other designation specified in the law or ordinance defining it, a sentence to a term of imprisonment which is not in excess of fifteen days is provided therein, or the only sentence provided therein is a fine”.
Section 26-248 (a) provides for a maximum fine of $5,000 and sets forth no jail alternative. It is solely a penalty provision and does not itself define an offense. It must be read with section 26-246, which denotes the conduct defined as an offense. Read together, they constitute a violation, not a misdemeanor. Section 26-248 (d) provides for a sliding scale of escalating fines for each repetition of the violation with a 90-day maximum jail alternative available at all times. Accordingly, section 26-248 (d) must be classified as a misdemeanor. Section 26-125 (a), charged in each superceding information, generally discusses penalties for Code violations; it does not itself constitute an offense capable of being violated. It neither adds to the information nor affects the grade of offense.
IV. SUFFICIENCY OF THE INFORMATIONS
A defendant charged with a misdemeanor has an absolute right to be tried by information. (CPL 170.65 [1], [3].) In order to constitute an information, an accusatory instrument must contain nonhearsay factual allegations sufficient to establish, if true, the defendant’s commission of every element of each offense charged. (CPL 100.40.)
If a misdemeanor prosecution is commenced by filing a "Tennyson” complaint containing hearsay, the instrument must be replaced by a nonhearsay information before the People can claim trial readiness. (People v Tennyson, 19 NY2d 573; see, People v Phillipe, 142 Misc 2d 574 [Crim Ct, Kings County], supra.) A violation prosecution must be commenced by filing a nonhearsay information. (CPL 100.10.) When a *244 prosecution is initiated by service of an appearance ticket, the action must be commenced by filing an instrument charging the offense listed on the appearance ticket. (CPL 150.50 [1].)
The original informations are defective in several respects. First, each information charges offenses not contained in the appearance ticket. Second, the informations plead neither prior notification to correct an administrative violation nor continuance of the violation thereafter, necessary elements of the penal violation. Third, the informations do not plead factual allegations of the defendant’s past conduct claimed to have been criminal. Rather, each contains an affixed photocopy of the punch list portion of the original violation letter, which conclusorily listed future work that the city then wanted defendant to do.
Fourth, the informations fail to disclose the basis, if any, of the deponent building inspector’s knowledge. Not only are the factual allegations insufficient to charge the offense; it cannot be determined that they are based on the firsthand, nonhearsay knowledge of the deponent. (See, CPL 100.15 [3].) Rather, the bizarre form of each information suggests something very different. Instead of an original statement of the defendant’s past conduct as witnessed by the deponent, each information contains the punch-list without any language linking it to the deponent’s personal knowledge. Neither the information nor any supporting deposition pleads that the inspector ever visited the premises, or made a return visit to determine that the administrative violations had been corrected. Nowhere is there a claim that the prior violation letter was ever sent. One cannot identify the person who prepared the violation letter, or the basis of the preparer’s information. Since the unattributed conclusions of the violation letter were incorporated by reference into the information, the circumstances strongly indicate that each information is based on hearsay.
Fifth, the dates of occurrence are pleaded in an impermissible vague manner. The city’s printed form reads as follows: "That on the_day of_, 19_and at various times prior thereto.” Not only does such an ambiguous formulation fail to give constitutionally adequate notice of the time of the offense’s alleged commission; it makes it difficult to determine Statute of Limitations issues. (See, part V, infra.)
Finally, the dates of occurrence pleaded in the informations not only support the view that the informations are legally insufficient; they suggest that no penal violation is provable. *245 The three informations on the 1985 dockets listed as dates of occurrence, "7/20/82”, "3/15/83” and "8/31/84”, respectively. These dates correspond to the dates of the violation letters. Since the gravamen of the penal offense is the failure to correct the administrative violation after having duly notified, any offense necessarily must have taken place after such notification. Use of the same date compels one of two conclusions: Either there was no prior notice before the date charged as the occurrence, or there was no penal conduct alleged or provable that occurred after the purported notice.
Each of the 1987 informations also incorporates by reference the punch-list from the corresponding prior violation letters, five of which date back to 1981. Nevertheless, each 1987 ticket and information lists the date of occurrence as June 2, 1987, the date on which the appearance tickets were purportedly issued. Even assuming, arguendo, that the tickets were based on the inspector’s personal observations on that date, there is no evidence of any prior or subsequent visit. Even if notice had been given and received six years before, it would have been stale indeed in 1987. Given the lack of evidence of any intervening inspection, one cannot assume that the cited problems were chronic, continuous and never corrected. If they had been corrected, and only later reoccurred, the original violation letter would not be a sufficient predicate for the prosecution. Where there has been no allegation, and no proof, of a return visit within a reasonable span of time disclosing the same violation, this court cannot presume that the violation was continuous. The People were required to plead a return inspection or other nonhearsay proof of noncompliance; they have not.
The superceding informations[13] exhibit similar and additional problems. In each of the new informations, an inspector states: "B. Defendant was not in compliance with notice of violation number _ which directed him to cure the various violations. This Notice of Violation was previously served on him. A certified copy of the notice of violation is attached hereto as Exhibit. 'B’.” At the foot of the document, above the signature, is the following language: "The above *246 statements are true based upon public documents, records maintained by the City of New York and deponent’s personal knowledge and observation.”
Each information at least sets forth allegations of notice and noncompliance absent from its predecessor. However, no factual basis is set forth and no source of knowledge is recited specific to any allegation. There is no allegation that the deponent ever personally observed the violation or ever made a return visit to determine if defendant corrected it. There is no allegation that the deponent himself served the notice of violation, or personally witnessed such service. Although a copy of the violation letter is attached to the information, there is no affidavit of service. Thus, the inspector’s unsupported allegations are merely conclusory, and not allegations of evidentiary fact. Even if the deponent’s allegations were based on other inspectors’ personal visits, the purported information could not be considered a nonhearsay statement. In short, the superceding informations appear to have been artfully drafted to conceal the deponent’s lack of exclusively personal knowledge.
Accordingly, no legally or factually sufficient information was ever filed in any of these cases. Although this objection was not raised by the defense, it is a nonwaivable defect and prevents this court from exercising subject matter jurisdiction.
The cases at bar are unfortunately not unique. The problems discussed are endemic to the city’s Administrative Code prosecutions in the Criminal Court. Part of the problem lies in the forms used. The blank informations are not worded in the form of personal observations; they provide no space for the deponent to indicate that he made repeated inspections. They contain vague and ambiguous circumlocutions.
More disturbing, however, is the city’s excruciatingly slow and inefficient enforcement process. The city has buried its enforcement efforts in paper. Administrative violations, once finally noted, are permitted to accumulate and lie dormant. Criminal cases are routinely filed without regard to the status of other cases and warrants pending against the same defendant. Cases involving the same building are permitted to proliferate, since they are not pursued. With the passage of time, the circumstances surrounding the underlying violations become hopelessly confused and virtually unprovable.[14]
*247 V. STATUTE OF LIMITATIONS
Defendant moves to dismiss one of the 1985 dockets, 5K967884U, on Statute of Limitations grounds. A misdemeanor prosecution must be commenced within two years of commission of the alleged offense; a violation prosecution must be commenced within one year. (CPL 30.10 [2] [c], [d].) The information alleges the date of occurrence as July 20, 1982. It is conceded that the ticket was not issued until December 1984, and that the information was filed thereafter. This docket therefore must be dismissed.
Statute of Limitations objections might have been raised as to other dockets, but were not. They must be deemed waived. A Statute of Limitations objection is waived unless it is promptly asserted. (People v Brady, 257 App Div 1000 [2d Dept].) Although the Criminal Procedure Law contains no specific waiver or toll provisions, the general concepts of toll and waiver, long recognized in civil law, should be applied to criminal cases. If a defendant has affirmatively sought relief from the court inconsistent with a position that the action is untimely, he should be deemed to have consciously and voluntarily waived the Statute of Limitations. No significant public policy then prevents the prosecution. Where a defendant represented by counsel moves to dismiss an action, and does *248 not raise the Statute of Limitations as a defense, it must be deemed waived. Where, as here, the defense was raised to 1 of 12 actions, and not to the others, the conclusion of waiver is even more compelling.
VI. SPEEDY TRIAL
A prosecutor is obligated to announce readiness for trial within 30 days of commencement of an action charging a violation. (CPL 30.30 [1] [d].) Defendant appeared for arraignment in response to the tickets on May 26, 1988. The People answered ready on all dockets on August 15, 1988, 81 days after arraignment. None of this time was excludable.[15] Indeed, since no sufficient information has ever been filed, the People could not have answered ready when they did, or at any other time.
Accordingly, the 12 dockets before the court are ordered dismissed.

. The Administrative Code of the City of New York was recodified in 1986. The former Code sections were to be used only until September 1, 1987, although they are still frequently used by certain city agencies. After September 1, 1987, references to a former section number are to be deemed references to the corresponding section under the recodification. (L 1986, ch 839.)

. "Violation,” used throughout Administrative Code of the City of New York titles 26 and 27, usually refers to the administrative violation cited by the superintendent’s violation letter. In other contexts, "violation” denotes a penal offense lower than misdemeanor. (Cf., Penal Law § 10.00 [3] ["an offense, other than a 'traffic infraction,’ for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed”].) The city calls the superintendent’s violation letter a "Notice of Violation”, but the form letter does not bear that title. Some of the traffic tickets issued by the city to initiate these actions do bear the wording "Notice of Violation;” the city, however, calls them "summonses,” which they are not. (See, part I [A], infra.) The Code uses the generic "notices” to cover documents issued by the city or a court, informing a person or directing something to be done. (See, especially, Administrative Code of City of New York § 26-244, and tits 26, 27, passim.)

. Nowhere in its papers does the city forthrightly state how tickets were ever served on, or transmitted to, defendant. Included in the court file for each docket, however, is an affidavit of personal service of the "summons.” It is not clear what document was purportedly served, since each affidavit was filed with apparently unrelated papers in the court file. The affidavits of personal service are replete with inconsistencies and apparent errors. While these affidavits are immaterial at this time (see, part I [C], infra), these irregularities are disturbing. Attached to the 1985 dockets are printed affidavit of service forms apparently executed by Inspector Robert Geib wherein he swears that he "personally served the summons [sic] in the above entitled action upon Joseph Young, the same person mentioned and described as defendant herein”. (Emphasis supplied.) The deponent states that he served all three "summonses” on the 1985 dockets on the same date, November 27,1984, while the dates of violations for these dockets are stated as July 20, 1982, March 15, 1983 and August 31, 1984. These affidavits were apparently sworn six days after service was purportedly effected. The same printed affidavit-of-service forms appear in the files of the 1987 dockets. Here, the deponent is Inspector Dominick Donaldson, who swears that he *235 served the "summons” (sic) "upon Ed Gutierez, the same person mentioned and described as defendant herein”. (Emphasis supplied.) The deponent states that he served these nine "summonses” on June 2, 1987 — the same date claimed as that of the administrative violation on all 1987 dockets. These affidavits were apparently executed 29 days after service was purportedly effected. Thus, different inspectors are using inconsistent methods of calculating the dates of occurrence of the alleged criminal violations. This practice has led, in part, to the serious problems discussed in part IV, infra.

. Although the informations are not dated, the court assumes they were filed on or before the return date.

. The superceding informations would have replaced the original accusatory instruments had the defendant been arraigned thereon. (CPL 100.50 [1].) Since the defendant’s presence was not required during motion practice, he has not been arraigned on the new instruments. Accordingly, the court rules on both sets of motions.

. When the copies of the tickets filed with the court (presumably by the city) are compared to copies of tickets bearing the same serial numbers, annexed as exhibits, it is evident that the city used different forms for the purported service on defendant and for retention as file copies. The court cannot determine whether the file copies were prepared at the same or a different time; however, based on the differences in wording and appearance of the forms, one cannot automatically assume that they are duplicate originals.

. An appearance ticket must direct a defendant to appear before the court. (CPL 150.10.) Although the city’s tickets nominally do so, the city’s procedures upon arrival at the courthouse direct something else. Without legal authority, the city diverts defendants to interviewing rooms to speak with Assistant Corporation Counsels about their cases prior to appearing before the Judge. By so doing, the city uses the tickets as improper "office subpoenas”. (People v Arocho, 85 Misc 2d 116 [Sup Ct, NY County]; Am Bar Assn Standards Relating to Administration of Criminal Justice, Prosecution Standard 3.1 [d].) Since most defendants in Building Code (Administrative Code of City of New York § 27-101 et seq.) prosecutions appear unrepresented by counsel, the circumstances lead them to believe that the city’s informal practice is an officially required court procedure. This practice has the appearance of impropriety and raises serious ethical questions. In this situation, many an unsophisticated defendant would think that the city’s attorneys are court officials mediating cases, rather than adversaries prosecuting them. Whatever is actually said, the circumstances are inherently misleading and coercive. It is not clear whether defendants genuinely understand their rights regarding counsel and self-incrimination. When the case comes before the court later in the day, an Assistant Corporation Counsel invariably announces that the defendant does not wish counsel and has agreed to plead guilty to a violation, not a crime, in exchange for an "agreed upon” fine. Most people passively agree, some more reluctantly than others, as an alternative to spending another day in court. With several hundred cases calendered each day, searching judicial inquiry is impossible. The city has been permitted to make the court look like a rubber-stamp administrative agency. This embarrassment must end. (See, n 14, infra.)

. Anyone receiving such a parking ticket form in the mail might ignore it, reasonably regarding it as an inept mistake or a feeble hoax. The city’s sloppy use of inappropriate forms reflects poorly on the seriousness and professionalism of its Code enforcement.

. The City Council should promptly correct this ambiguity by amending Administrative Code of the City of New York § 26-244 to specifically authorize inspectors and other appropriate departmental employees to issue and serve appearance tickets. If the city were not authorized to initiate a prosecution by issuing appearance tickets, the city would be obligated to first file an information with the court, obtain judicial approval of a summons or arrest warrant, and then personally serve the summons or arrest the defendant. Such a procedure would only increase the current burden on the city and the Criminal Court.

. The apparent statutory conflict poses an issue of State-local preemption. A method of service, prescribed by the State, cannot be altered by local *239 law absent enabling legislation. Yet, the conflict may be more apparent than real. The local law requires personal service, not service by personal delivery. The terms are not synonymous. Personal delivery means a hand-to-hand transfer only, e.g., as under CPLR 308 (1). Personal service generally embraces a hand-to-hand transfer, and other means of delivery to the defendant, and may include mail if permitted by statute. (See, McLaughlin, Practice Commentary, McKinney’s Cons Laws of NY, Book 7B, CPLR C308:l, at 299; Siegel, NY Prac §72.) In contrast, parking tickets are routinely and permissibly served by mere posting on the vehicle, not by any means of personal service. Contextually, however, "personal service” in the Criminal Procedure Law seems to be used to mean "personal delivery.” For the reasons stated infra, it is unnecessary to determine here whether the preemption doctrine should be applied or if mail service is impermissible.

. The method of service would be significant if the prosecution chose to proceed by appearance ticket, and if it later sought to penalize the defendant’s nonappearance. Thus, improper service would be a valid defense to a prosecution for the crime of failing to respond to an appearance ticket, since personal service of the ticket is an element which the prosecution must prove. (Penal Law §§ 215.58, 215.59.) Similarly, it could be raised on a bail application after arrest on a warrant issued upon nonappearance. To hold otherwise would deprive a defendant of due process. No such issue has been presented here.

. The former Rules of the Criminal Court, promulgated jointly by the Appellate Divisions, First and Second Departments, provided for a separate part of the court in each borough to adjudicate offenses arising under the Administrative Code of the City of New York. (Former Crim Ct Rules, 22 NYCRR 2950.1.) This rule must be considered a housekeeping provision only. A court rule cannot confer subject matter jurisdiction. One court (e.g., the Appellate Division of the Supreme Court) is legally incapable of granting another court (e.g., the Criminal Court) subject matter jurisdiction. To hold otherwise would violate the principle of separation of powers. Fundamental democratic theory requires that a change in subject matter jurisdiction, like any amendment of the Constitution or statute, be effected by appropriate constitutional or legislative enactment. In any event, the former Criminal Court rule has been superceded by the Uniform Rules for Trial Courts, effective January 6,1986. (22 NYCRR 200.20 et seq.)

. An amendment can be sought to an existing instrument by leave of court for the purpose of adding a new charge if the original sworn allegations are sufficient to support the proposed new charge. Such amendment must be sought by motion. (CPL 100.45 [3].) Significantly, the city did not make an application to this court for such relief. Rather, without leave, the city filed and served the superceding informations.

. Experience has shown that the criminal process is an ineffectual tool *247 for correcting the large volume of routine Administrative Code of the City of New York violations. It has been long recognized that the limited menu of available criminal remedies neither compels landlords to make repairs nor deters them from repeated violations. (See, People v Sybil Holding Corp., 64 Misc 2d 693 [Crim Ct, NY County]; Gribetz and Grad, Housing Code Enforcement: Sanctions and Remedies, 66 Colum L Rev 1254, 1276 [1966].) The high volume of cases places an enormous burden on the Criminal Court and the city itself, making repeat inspections difficult and adequate case preparation rare. Most garden variety Code prosecutions should be diverted to an administrative adjudication tribunal which could expeditiously determine them civilly without the rigorous pleading and evidentiary requirements of the criminal law. If the city must resort to court, the lower standard of proof, liberal pleading rules and swift and sweeping remedies of the civil law, including injunctive relief, are much better suited to correcting Code violations. If a monetary sanction is appropriate, logic dictates that it be sought in a forum where it is easier to prove. Particularly given the city’s limited resources, resort to the Criminal Court should be reserved for a small number of egregious cases involving incorrigible owners for which the city seeks imprisonment, cases that the city must be able to adequately prepare and prove. (See also, Report of Task Force on Civilian-Initiated Complaint Process in the New York Criminal Court Office of Ct Admin, at 59-63 [June 1989].) For too long, the city has written its own ticket in the Criminal Court. Henceforth, it must respect the standards which the law requires of all prosecutors.

. It is therefore unnecessary to determine here whether the city exercised due diligence in attempting to locate the defendant between the issuance of the bench warrants in 1985 and 1987, and defendant’s voluntary surrender in 1988. (See, CPL 30.30 [4] [c].) Curiously, the 1987 tickets were issued to defendant and concedédly received by him while warrants were outstanding for well over a year on the 1985 dockets. The city’s issuance and defendant’s receipt of the 1987 tickets (attached to defendant’s original motion papers) demonstrate that the city knew exactly where to find defendant during that period. One can only speculate why no attempt was made to execute the arrest warrants.