## State of Vermont v. Alan R. Groth

[481 A.2d 26]

No. 82-426

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed July 13, 1984

586

*John A. Rocray,* Windham County State's Attorney, Brattleboro, for Plaintiff-Appellee.

*James W. Stevens,* Brattleboro, for Defendant-Appellant.

**Peck, J.** Following a trial by jury, defendant was convicted of possessing a loaded rifle while in a motor vehicle on a public highway in violation of 10 V.S.A. § 4705(b). He filed a timely appeal from the judgment entered on a verdict of guilty. We affirm.

Defendant presented two claims of error for review by this Court. First, whether the trial court erred in an alleged failure "to instruct the jury fully and completely on the law of constructive possession." More specifically, the defendant's claim relates to the refusal by the trial judge to instruct on

the issue of intent. Second, whether the lower court erred in denying defendant's motion for judgment of acquittal and for judgment notwithstanding the verdict. This second issue addresses his contention that seizure of the loaded rifle by the arresting officer was illegal, and accordingly, the rifle itself and all testimony relating thereto should have been suppressed.

For a full understanding of the circumstances surrounding the arrest, some background information is necessary.* A rally by members of a highly controversial organization was scheduled to be held in the town of Wilmington, Vermont, on May 15, 1982. Public feeling against the organization and the proposed rally apparently ran high in the community. Posters expressing anti-organization sentiments appeared in various public locations, and the authorities became increasingly concerned that the rally might lead to open violence by or against the organization. As the day of the rally drew closer, members of the local police, and the state police in the area, were directed to be especially alert as members of the organization arrived for their meeting.

On the evening of May 14th, a Wilmington police officer, who was patrolling the area in his cruiser, received a complaint about persons who had been drinking and tearing down the anti-organization posters in the town.

At approximately one o'clock in the morning of the 15th, the officer observed a vehicle backing into the entrance of a parking lot. He stopped to question the driver of the car about the complaint he had received. Inside were four men, two in front and two on the back seat. One of the men seated in back got out of the car and came towards the officer, who observed that he was wearing a side arm. The man made no move towards the weapon, nor did he do or say anything that was construed by the officer as threatening. Nevertheless, through the open door of the car, the officer was able to see a rifle lying on the floor in front of the rear seat, close by the defendant who was the second man seated in the back.

After instructing the armed passenger who approached him to put his hands up on the car, the officer seized the rifle, and

---

* All of the facts recited here derive from the testimony of the arresting officer who was the only witness at the trial.

instructed the three men still seated in the car to place their hands where he could see them thus forestalling any possibility of the rifle, or any other weapon that might be available, being used against him. The officer inspected the gun and determined that it was loaded, and thereupon inquired as to its ownership; the defendant acknowledged the gun was his. Based on this response, the officer arrested the defendant and the driver of the car for possession, and subsequently, at the express direction of the chief of police, he arrested the other two occupants of the car on the same charge.

Two additional facts have some significance. Although it was never established at trial that the four men in the car were members of the controversial organization, it was established that they had driven from Connecticut to Vermont to attend the rally. Moreover, at least two of the men, including the defendant and the man who got out of the car, wore T-shirts, under open outer shirts; the T-shirts bore the name of the organization, clearly visible to the officer. The driver of the car admitted to the officer that they had been tearing down some of the controversial posters. Finally, none of the four men made any overt threats towards the officer; in fact he described them as being generally cooperative.

## I.

Defendant complains first, that in instructing the jury on the meaning of constructive possession, the trial court failed to include the element of an "existing intent to exercise dominion or control over the [rifle]." He cites us to several federal and state court decisions in which such an intent is referred to as an important concern. See, e.g., *United States* v. *Craig*, 522 F.2d 29, 32 (6th Cir. 1975).

■ It is true, as this Court has held, that "[a]ctual and constructive possession are often so blended that it is difficult to see where one ends and the other begins." *State* v. *Ballou*, 127 Vt. 1, 6, 238 A.2d 658, 662 (1968) (quoting *State* v. *Gaudin*, 152 Me. 13, 16, 120 A.2d 823, 825 (1956)). Regardless of fine lines that have to be drawn in particular cases, the rifle, which was the subject of the possession question here, was conceded to be defendant's personal property. He sat alone

in the back seat of the car when the officer discovered it. The gun lay at his feet within inches of his body and his hands. He needed only to reach out in order to grasp it. The issue of actual or constructive possession cannot be resolved in every case by answering the simple question whether the person actually holds an object in his hands or carries it on his person. "A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it." *United States* v. *Wolfenbarger*, 426 F.2d 992, 994 (6th Cir. 1970) ; Black's Law Dictionary 1047 (rev. 5th ed. 1979).

■ In a 1981 case involving a pistol thrown from a car driven by the defendant while being pursued by the police, the Supreme Court of Rhode Island, holding that possession was *actual*, rejected defendant's contention that the trial court erred in failing to instruct the jury on the element of dominion and control. *State* v. *Benevides*, — R.I. —, —, 425 A.2d 77, 80 (1981). Similarly, on the facts of this case, we hold that defendant had actual possession of the rifle; the court's charge on actual possession was sufficient and has not been challenged. Accordingly, there is no need to reach defendant's claim of error on the first issue.

## II.

Defendant claims next that the trial court erred in declining to grant his motions for judgment of acquittal and for judgment notwithstanding the verdict. These motions incorporate, and are based on, his motion to strike admission of the rifle as well as the arresting officer's testimony relating to his seizure of the weapon. Defendant's argument is predicated on the claim that the seizure of the rifle and the subsequent examination (search) thereof for live ammunition was illegal.

Although the instant case does not involve the typical "pat down" search of the person, see *Terry* v. *Ohio*, 392 U.S. 1 (1968), the defendant analogizes the two situations. He contends, and cites a stream of cases holding that the key is safety, in this case the officer's concern for his own safety, which concern he argues, "must be drawn from contemporaneous, specific and articulable facts which would yield a belief in the mind of a reasonable person similarly placed that his safety . . . is at risk because the person detained is armed and pres-

ently dangerous." Contending that this is the standard to be applied here, defendant argues vehemently that it was not satisfied. The record, he charges, simply fails to demonstrate that the officer feared for his safety at the time he seized the rifle. He argues that the totality of the circumstances fails to disclose any action by any of the four men even remotely threatening to the officer before the rifle was seized, at the time of the seizure, or at any time thereafter. When the officer seized the rifle, claims the defendant, he did not do so because he perceived a threat to his safety.

This construction ignores a substantial portion of the evidence of the surrounding circumstance. Moreover, if some overt threat or threatening act is a prerequisite, it would place the police in an untenable position; an officer might well be dead of a gunshot wound inflicted by the seemingly innocuous, even friendly appearing, and apparently cooperative person before him. He might indeed be confronted by Chaucer's "smylere with the knyf under the cloke" and never realize it until it is too late. An officer is not required to experience trembling fear or an overt threat as a prerequisite to reasonable action which protects his safety.

Contrary to defendant's assertion, the officer articulated his concern most persuasively. Because of the scheduled "rally," an aura of danger and the possibility of trouble, including outright violence, regardless of its source, pervaded the town and had become a matter of anxiety to local authorities for several days. This general feeling of tension apparently increased as the day of the rally grew nearer. Posters critical of the rallying group had appeared publicly.

On the evening before the scheduled meeting, and into the following morning until the seizure incident occurred, the arresting officer testified that he had been especially alert for trouble. He had received the report of posters being torn down by persons who had been drinking. This fact itself suggested the possibility of trouble, and he was actively investigating the report.

The officer did not stop the car in which the four men were riding; it had already stopped when he first spoke to the occupants. Two of the men, one of whom was the defendant, were seen by the officer to be holding open beer cans. The men were,

or were reasonably believed by the officer to be, members of the group which was to hold the rally later in the morning. The driver of the car informed the officer that the four had been engaged in tearing down the posters.

One of the men opened the door of the car and approached the officer, who saw that he was wearing a side arm. Although he made no move suggesting any intent to use the gun, and in fairness we may speculate that he had no such intent, nevertheless, it is no more than speculation and a risky one certainly for the officer.

The officer did not open the door of the car in order to inspect the interior, before discovering the rifle. It lay on the floor at defendant's feet in plain view after the door had been opened by the armed occupant. The officer could not tell at that point whether any of the three men who remained in the car were armed, or whether there might be a handgun readily available to each or any one of them.

Finally, when asked if anyone in the car made any move "to go for the rifle," the officer testified, "They did not have a chance. As soon as I saw the rifle there I stated to them to put their hands where I could see them." The State argues, and we agree, that this is evidence that he acted for his own protection. If he saw the need to seize the rifle for that purpose, it indicates as well that he felt some apprehension for his personal safety.

■■■ Under the circumstances described above, with the additional factor that the officer was alone, confronted by four men at one o'clock in the morning, we cannot accept defendant's argument that the seizure and search of the rifle, which lay before him in plain view, was illegal. In *Michigan v. Long*, — U.S. —, 103 S. Ct. 3469 (1983), cited by the State in its brief, the Supreme Court acknowledged the particular hazards faced by police officers in automobile cases. *Id.* at —, 103 S. Ct. at 3479–80. The Court stated that the key is "reasonableness"; there is " 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' " *Id.* at —, 103 S. Ct. at 3479 (quoting *Terry* v. *Ohio, supra,* at 21, in turn quoting *Camara* v. *Municipal Court,* 387 U.S. 523, 536–37 (1967) ). The validity of protective searches

and seizures is clearly recognized by the United States Supreme Court, subject only to the test of reasonableness, which must be determined on a case by case basis. *Id.* This Court is in accord. *State* v. *Miller*, 142 Vt. 49, 52–53, 451 A.2d 1115, 1116–17 (1982). Given the background and the facts and circumstances disclosed by the record here, we hold that the reasonableness test was more than satisfied as well as the "apprehension" standard proposed by the defendant. Accordingly, no error appears in the trial court's refusal to grant his motions for judgment of acquittal and for judgment notwithstanding the verdict.

*Affirmed.*