OPINION OF THE COURT
C. Stephen Hackeling, J.
The matter before the court is the defendant’s application dated September 17, 2002, seeking the suppression of evidence *484 obtained as a result of the warrantless search conducted by agents of the Town of Huntington on July 17, 2000 (hereafter the Town). The court scheduled and conducted a suppression hearing on December 4, 2002 over the Town’s timeliness and waiver related objection raised under the provisions of CPL 255.20. It is the court’s opinion that the defendant’s constitutional privacy/suppression rights cannot be circumscribed by a mere statute whose main purpose is to expedite discovery and jurisdictional challenges. (See generally People v Amadeo, 188 Misc 2d 187 [Sup Ct, Queens County 2001]; People v Gonzales, 148 Misc 2d 973 [Westchester County Ct 1990].)
Findings of Fact
The following testimony was elicited at trial or is undisputed and is determined by the court to be findings of fact:
(1) Defendant, Mary Bifulco (hereafter defendant), is the owner of 549 Park Avenue, Huntington, New York (hereafter the premises), which exists in an R-7 residential zone.
(2) The premises are improved by at least two separate structures consisting of the main house and a detached garage. The main house predates the Town of Huntington Zoning Code and has a “letter-in-lieu” certification which does not include the detached garage. (See exhibit D of defendant’s Sept. 17, 2002 application.) It is important to note that a “letter-in-lieu” certification does not indicate how many residential units are in the structure. Despite the Town’s Zoning Code, whatever occupancy uses existed in 1934 are “grandfathered” and preserved as long as they are continuous. (Keller v Haller, 226 AD2d 639 [2d Dept 1996].) The defendant alleges the main house was a multiple-family dwelling pre-1934.
(3) Defendant received an accessory apartment permit (hereafter the permit) on or about February 8, 1993 to maintain a second residential unit on the premises. (See exhibit E of defendant’s Sept. 17, 2002 application.) The permit or testimony does not indicate if it was for the main house or the detached garage. The second apartment was constructed in the garage in spite of the fact that paragraph 5 of the accessory apartment board’s findings indicates that the “Accessory Apartment contemplated will not substantially change the single family appearance of the dwelling.” The conditions for the permit are as follows:
“(a) The owner consents to inspections of the *485 premises for the purpose of determining continuing compliance with the provisions of Section 198-133 between the hours of 9:00 a.m. and 9:00 p.m. upon reasonable notice to the owner.
“(b) The owner consents to inspections of the premises within 60 days after the expiration of the special use permit for any reason as prescribed in Section 198-34A between the hours of 9:00 a.m. and 9:00 p.m. upon reasonable notice to the permit holder.
“(c) Payment of one year fee of $400.00 within thirty days of the date of this resolution.
“(d) The owner will provide unobstructed off street parking for two automobiles and will provide off street parking on the premises for all tenant’s automobiles.
“(e) The owner agrees to provide and maintain in working order smoke detectors on each floor of the premises.
“(f) Pursuant to Local Law 1-1991, there must not be more than a total of five (5) persons living in both apartments on the premises.
“(g) The owner must secure the handrail on the interior main level stairway.
“(h) The owner must install smoke detectors on all floors of the dwelling, including the apartment.
“(i) The owner must make the door to the heating/ boiler room self-closing and fire retardant.
“(j) The owner must obtain a plumbing permit for the kitchen sink in the apartment.
“(k) The owner must supply the Board with copies of the deed, survey and Certificate of Occupancy for the dwelling and floor plans of the entire dwelling.
“(/) The owner must pay $1,000.00 cash security pursuant to Section 198-144 of Local Lawl-1991 within thirty days of the date of this resolution.”
(4) The accessory apartment permit enabling legislation (§ 198-133 [D]) limits accessory apartments to a single-family residential dwelling within the owner’s principal dwelling.
(5) The defendant’s permit expired in 1995 pursuant to Town of Hungtington Zoning Code § 198-134.
(6) The Town refused to renew the accessory apartment permit upon the grounds that the accessory apartment statute *486 did not allow a permit for an apartment in a detached structure outside the single-family owner occupied dwelling.
(7) During 1998, the defendant was continually summonsed for the unrenewed unauthorized apartment which resulted in a guilty plea and the issuance of a “conditional discharge” requiring her to come into compliance with the Town’s Zoning Code or to receive approval for the apartment from the Town.
(8) Defendant continually made application for an accessory apartment permit thereafter, and was not issued same as the housing inspectors did not want to certify the appropriateness of the permit in contravention of the express language of the statute to limit same to a single-family dwelling.
(9) At defendant’s request, and with the intercession of elected officials, Housing Inspector Parker was directed by his supervisors to contact defendant to inspect the premises which resulted in a consensual joint inspection on July 17, 2000. Defendant’s preconceived understanding of the scope of the inspection was that it was limited to the detached garage. This view was derived from conversations with individuals other than Inspector Parker.
(10) Defendant initially refused inspection of the main house after granting access to the detached garage. Defendant did reluctantly grant access to the main house after being told by Inspector Parker that Town policy requires an inspection of all structures on the lot as the accessory apartment can never allow more than two residential units or eight people living on one lot. The inspector advised that he would leave if access was not granted.
(11) Defendant testified that she resides in the detached garage and rents the main house.
(12) As a result of the July 17, 2002 inspection, Inspector Parker issued three summons to defendant alleging that defendant does not have a town authorization for a two-family occupancy of the main house, a single-family occupancy of the detached garage, and for multiple residential dwellings on a single-family lot.
Discussion
It is a fundamentally unchallengeable federal and New York State constitutional concept that searches of residential dwellings by governmental agents can only be conducted upon judicial warrant or consent of the homeowner. (Payton v New York, 445 US 573 [1980]; Camara v Municipal Ct. of City & *487 County of San Francisco, 387 US 523 [1967].) In the absence of a warrant, the Town subscribes to the theory that the defendant consented to the July 17, 2002 governmental inspection/ search. The defendant asserts that the search was based upon “statutorily coerced consent” and offers an emerging body of case law in furtherance of the suppression of all observations made by Inspector Parker as a result of the July 17, 2002 search. (Pashcow v Town of Babylon, 53 NY2d 687 [1981]; Sokolov v Village of Freeport, 52 NY2d 341 [1981]; Town of Brookhaven v Ronkoma Realty Corp., 154 AD2d 665 [2d Dept 1989]; Town of Brookhaven v Almeida, NYLJ, Aug. 21, 2002, at 22, col 11 [Sup Ct, Suffolk County, Eerier, JJ.)
The underlying premise in the New York Court of Appeals “statutorily coerced consent” rule is “an owner’s ability to rent his premises may not be conditioned upon his consent to a warrantless inspection.” (Pashcow v Babylon, supra at 688.) Similarly “a property owner cannot * * * voluntarily give[ ] his consent to a search where the price he must pay to enjoy his rights * * * is the effective deprivation of any economic benefit from his rental property.” (Sokolov v Freeport, supra at 346.)
Having established the applicable rule of law, the court now must apply the facts at hand. The principal differentiating fact is that defendant’s precedent involves local government’s conditioning the ability to rent legally zoned real property upon statutory consent to a warrantless search. The facts presented suggest that this is only partially the case.
The Garage Apartment
Defendant’s situation is different in that the inspection was a precondition to her being granted a “zone change” to allow her to occupy or rent a garage for which she had no preexisting right to occupy or rent. In this instance there exists no governmental “deprivation of economic benefit for the rental property,” as defendant’s single-family zone status did not allow for any rental/economic benefit. Defendant had no “right” to occupy/or rent the garage. Defendant was being granted a privilege to expand her occupancy/rental opportunities conditioned upon an inspection to determine that the prerequisites of the accessory apartment statute were being met. This is the only logical and practical determination that can be made, as to do otherwise would render all municipal variance and zone change conditions unenforceable as no inspection for compliance of same could be accomplished.
Defendant was not coerced into an inspection. She initiated and conducted the inspection to facilitate the issuance of a *488 permit to occupy a structure in contravention of the existing law. The court is also mindful that the principal motivating factor for the inspection/search was not defendant’s desire to rent her garage apartment, but was rather her desire to come into compliance with her “conditional discharge,” which required her to obtain a permit before renting the apartment.
The House
The defendant understood that there exists a distinction between the house and the detached garage, in that the right to occupy a garage is different than the right to rent a house which predated the Town Zoning Code and which can have whatever continuous use existed since 1934, including a multifamily dwelling. Unlike the garage apartment, the defendant does have the right to rent her house. Under the Pashcow precedent she cannot statutorily consent to its search as a coercive precondition to a governmental grant of authority even as to another parcel or structure.* This would create the deprivation of an “existing” economic benefit which the Court of Appeals sought to protect. It is also clear that the house search was not defendant’s idea, was initially resisted, and eventually was accomplished as a result of defendant’s reliance upon the inspector’s advice that the accessory apartment application would be on hold until the inspection was completed.
Directive
Accordingly, the court suppresses any evidence to be proffered by Inspector Parker which is related to, or arising out of, his inspection of the main house and will allow the Town to introduce evidence as to the inspection of the detached garage and grounds of 549 Park Avenue, Huntington, New York, subject to other evidentiary restrictions.

 This court could further distinguish this case from precedent in that technically the Town’s accessory apartment statute was not preventing defendant from renting her house. The appellate precedent involved “Rental Permit” statutes which prohibited rental until after a coerced search. Here, defendant could still rent her house regardless of the fate of her accessory apartment permit. However, the Court of Appeals appears to have painted with a broad enough brush to indicate that statutorily coerced searches for dwellings which have existing economic benefit should be strictly construed against the government, and this court declines to narrow this holding.