OPINION OF THE COURT
Bakbaka Jaffe, J.
By affirmation of emergency, order to show cause and petition/affidavit, petitioners seek pursuant to CPLR article 78 an order reviewing the seizure of their seven-year-old mixed breed dog, Ceasar, declaring the determination by respondent Department of Health and Mental Hygiene (DOHMH) to execute Ceasar pursuant to New York City Health Code (24 RCNY) § 161.07 (Health Code) unconstitutional as preempted by Agriculture and Markets Law § 123 and arbitrary and capricious and/or ultra vires, enjoining the enforcement of Health Code § 161.07 and all proceedings thereunder seeking the execution of Ceasar, directing his release from solitary confinement to petitioners’ custody, ordering that respondents take no further action against Ceasar, and ordering that pending the hearing and determination of the motion, that respondents take all reasonable steps and make all reasonable accommodations to protect him and maintain him in good health. They also seek reasonable attorney fees, costs, and disbursements. Respondents oppose.
I. Background
The incident leading to Ceasar’s custody was reported to a police officer who prepared a report on it at 8:00 a.m. on May 17, 2016. The report reflects that at 7:35 a.m. that day, Ceasar was unleashed, that he killed a dog and injured the dog’s • owner, and that the officer reported the incident to the Animal Bite Unit at the Department of Health and brought Ceasar to the Staten Island Animal Care Center. (Verified answer, exhibit A.)
In a letter dated May 18, 2016, DOHMH notified petitioners of the incident and that Ceasar had been brought to a shelter run by respondent New York City Animal Care and Control, Inc. (ACC) for 10 days of observation to determine if he was rabid, and that they could seek his release following that period. They were also thereby notified that an investigation would be conducted to determine if Ceasar is dangerous and whether he could be safely returned to their custody without presenting a public danger. Should it be determined that Ceasar should be returned to petitioners’ custody, DOHMH also advised that it would then be determined if conditions should be imposed on his return, and that if petitioners *867 agree, they would be asked to enter into a formal agreement. Petitioners were further notified in the letter that absent such an agreement, or upon a determination that Ceasar should not be released to petitioners but should be humanely euthanized or permanently removed from the City, then within 15 days after Ceasar’s removal to the ACC shelter, a petition and notice will be mailed to them, by which a hearing to be held at the New York City Office of Administrative Trials and Hearings (OATH) will be scheduled within 20 days, and that at the hearing they “may show cause, by presenting evidence, that the dog is not dangerous, and why the dog should be returned to you.” (Id., exhibit B.)
By letter dated May 23, 2016, DOHMH notified petitioners that it had decided to continue holding Ceasar beyond the 10-day rabies hold, and again advised that they would receive a petition and notice of hearing at OATH. (Id., exhibit C.)
On or about May 28, 2016, petitioners demanded Ceasar’s return. (Aff of Kristina Panattieri, July 29, 2016 [July 29 aff].)
By petition and notice of conference dated June 9, 2016, petitioners were notified that pursuant to New York City Health Code (24 RCNY) § 161.07, DOHMH was seeking to euthanize Ceasar on the ground that he was considered dangerous within the meaning of section 161.02 and poses a risk to public safety. Petitioners were also therein advised that pursuant to Health Code § 161.07 (f) and Rules of City of New York Department of Mental Health and Hygiene (24 RCNY) § 7-02, a settlement conference was scheduled at OATH for June 16, and that absent a resolution or upon petitioners’ failure to appear at the conference, a default would be entered resulting in their inability to present evidence, and that an OATH administrative law judge (ALJ) would recommend an appropriate penalty to the Department’s Commissioner. The charges lodged against Ceasar were set forth, along with a summary of the circumstances* supporting the opinion of a certified applied animal behaviorist who, after observing Ceasar at the shelter, made a preliminary determination that Ceasar is “too danger *868 ous to other dogs as well as to people who are walking or are accompanied by other dogs to be released back to [petitioners] or to the general public,” and that euthanization was the only safe option. (Verified answer, exhibit D.)
At the June 16 conference, the parties were unable to resolve the matter. A hearing was scheduled for August 4, 2016, a date mutually convenient to the parties. (Id.) In the interim, petitioners interposed this petition.
At oral argument on the order to show cause, I declined petitioners’ request for a stay, observing that a favorable determination by the ALJ at OATH would render unnecessary a decision on the constitutionality of the pertinent New York City Health Code provisions. On August 10, Ceasar was brought to a veterinary hospital, having contracted pneumonia. (Id.)
By telephone conference call on August 18, 2016, the parties advised that with the parties’ consent, the ALJ at OATH had put off the hearing to November 1, 2016, pending my decision, and that they too wanted a prehearing decision from me.
II. Petition
Petitioner Kristina Panattieri alleges that Ceasar is being illegally detained and subject to “summary execution,” and that his continued custody following the expiration of the 10-day rabies hold, absent any display or suggestion of aggressive conduct, is arbitrary and capricious, and in contravention of the Agriculture and Markets Law, and she complains that “[t]o date no proceeding has been instituted in any Court as required pursuant to the clear mandate of [section 123], which statute was made applicable to NYC pursuant to the explicit terms of Agriculture and Markets Law § 107 (5).” She denies that Ceasar caused injury to a person, that he has a known vicious propensity, and that he has ever unjustifiably attacked a person so as to cause injury or death, and argues that therefore, he is not a dangerous dog as defined in section 123. She also alleges, without any indication that she witnessed the incident, that “in fact any bites alleged were caused by the complainant’s own dog biting him after he picked him up to take him to the vet after the incident.” (July 29 aff.)
Petitioners thus argue that the Health Code violates state law, and as the Health Code places the burden of proof on dog owners and disallows their defense that Ceasar was provoked to attack, it also violates the Fourth and Fourteenth Amend *869 ments of the United States Constitution, analogous provisions of the New York State Constitution, and 42 USC § 1983. They also allege that DOHMH has committed a fraud on them by issuing an illegal order of execution, and that Ceasar has grown ill while in custody and is not being appropriately treated. They claim that their property rights are thereby violated. (Id.)
III. Respondents’ Verified Answer and Contentions
Respondents submit the affidavit of complainant Eugene Charles, the alleged victim, who states that as he was walking his chihuahua on a public street near petitioners’ home on Staten Island, petitioners’ mixed breed pit bull, Ceasar, ran toward him and lunged at the chihuahua. Charles lifted the chihuahua as a protective measure, and Ceasar grabbed and dragged the chihuahua, still held by Charles, along the sidewalk, as Charles tried to get Ceasar to release the chihuahua. Ceasar also bit Charles’s arms and hands. His chihuahua died on the sidewalk, and Charles was taken by ambulance to Staten Island University Hospital where he was treated for approximately 18 bite wounds. (Verified answer, exhibit A.)
Respondents contend that Agriculture and Markets Law § 107 (5) permits respondent City to adopt its own program for the control of dangerous dogs as long as it is no less stringent than the state program, which, in accordance with the section’s legislative intent, means that it may not be less stringent in protecting the public’s health and safety. As section 161.07 of the Health Code is no less stringent than Agriculture and Markets Law § 123 and as it is in fact more stringent in terms of giving the City greater control over dangerous dogs, they argue that the Health Code comports with state law. (Mem of law, Aug. 10, 2016.)
Respondents specifically maintain, without dispute, that both the Health Code and the Agriculture and Markets Law require a preliminary determination that a dog is dangerous before the dog may be taken from its owner and/or kept in a shelter. Under the Agriculture and Markets Law, that determination is made by a judge based on a probable cause standard, whereas under the Health Code, the DOHMH makes the determination, and is required to “consider the circumstances of the incident resulting in the dog’s placement in the shelter, the nature and severity of the injuries reportedly inflicted by the dog, and the dog’s prior history of biting and/or causing injury.” (Health *870 Code § 161.07 [d] [1].) The Health Code also permits the DOHMH, if it deems necessary, to consider an animal behavior-isms assessment of the dog. (Id.) It also provides that a police officer’s record of a bite or other injury constitutes prima facie evidence that a dog is dangerous. (Health Code § 161.02.)
Respondents also observe, without dispute, that both the Agriculture and Markets Law and the Health Code require that a hearing be held to determine whether a dog is dangerous. At the hearing under the Agriculture and Markets Law, the burden is on the party seeking a determination that the dog is dangerous to prove that the dog is dangerous by clear and convincing evidence, whereas under the Health Code, the burden is on the DOHMH by a preponderance of the evidence. Respondents maintain that this lower evidentiary burden is more protective of health and safety as it permits the City to more easily impose control over dangerous dogs, and observe that the dog owner may appeal an adverse determination to the Board of Health and then by commencing a CPLR article 78 proceeding. Respondents also assert that both the Agriculture and Markets Law and the Health Code protect dog owners while also protecting the public by permitting a dangerous dog to be held at a shelter pending a final determination only after there has been a preliminary determination that the dog is dangerous. They thus argue that the Health Code’s procedures are more comprehensive and therefore more protective of public health and safety than the Agriculture and Markets Law. (Id.)
In response, petitioners argue that notwithstanding the authority given the City to adopt its own program for the control of dogs, the program set forth in Agriculture and Markets Law § 123 must be followed, observing that the Health Code was adopted before the enactment of Agriculture and Markets Law § 107 (5). Solely in support of their argument that state law preempts the Health Code as a result of the conflict between the state law’s provision that a judge preliminarily determine whether there exists probable cause and the Health Code’s delegation of that determination to DOHMH, petitioners invoke the Fourth Amendment. They reiterate their claims of a deprivation of due process, and newly maintain that the Board of Health usurped its authority in enacting section 161.07 of the Health Code, which constitutes an improper exercise of a legislative function. (Petitioners’ response to respondents’ verified answer and mem of law, Aug. 12, 2016.)
*871 IV. Analysis
In 1997, Agriculture and Markets Law § 107 was amended by adding, inter alia, subdivision (5), which provides as follows:
“Nothing contained in this article shall prevent a municipality from adopting its own program for the control of dangerous dogs; provided, however, that no such program shall be less stringent than this article, and no such program shall regulate such dogs in a manner that is specific as to breed. Notwithstanding the provisions of subdivision one of this section [exempting any city having a population of over two million], this subdivision and sections one hundred twenty-three, one hundred twenty-three-a and one hundred twenty-three-b of this article shall apply to all municipalities including cities of two million or more.”
The legislative purpose in amending section 107 was “to protect the public from unprovoked attacks by dangerous dogs.” (Senate Introducer Mem in Support, Bill Jacket, L 1997, ch 530.) The justification for the amendments is set forth in the bill jacket as follows:
“Considering the recent increase of unprovoked dog attacks that have occurred in New York State, many have called for stricter penalties for the owners of dangerous dogs. The bill places strong emphasis on the concept of responsible pet ownership. If pet owners are made aware of the dangers of owning a violent dog. and know that they will be held accountable for the behavior of such an animal, the burden will be placed squarely on the owners of these dogs.” (Id.)
Consonant with the state’s legislative intent, article 161 of the Health Code was amended in 2010 (eff Apr. 22, 2010) in order “to provide adequate legal tools for the Board [of Health] and DOHMH to more effectively address the City’s current public health needs related to animals, and to better harmonize its provisions with other applicable law.” (City Rec, Mar. 23, 2010 at 693.) Thus, section 161.07 was repealed and recodified in its entirety to create “procedures for addressing the perennial problem of dogs that are a danger because their owners are generally unable or unwilling to control them,” and to provide a hearing to an owner disagreeing with DOHMH’s determination as to the dangerousness of his or her dog and to set a length of time that a dog which has inflicted injuries may *872 be kept in a shelter prior to the hearing. (City Rec, Mar. 23, 2010 at 694.)
To the extent that section 107 (5) is ambiguous, I construe it as permitting a municipality such as the City to adopt its own program for the control of dangerous dogs. That it also provides that sections 123, 123-a, and 123-b of the state law “shall apply to all municipalities including cities” such as the City, does not prohibit it from adopting a program that is as or more stringent than those sections, so long as the program is not less stringent than the state program set forth in Agriculture and Markets Law § 123, and does not regulate such dogs according to breed. Thus, where a municipality such as the City does not adopt its own program for the control of dangerous dogs, it must abide by the state law. There is no other way to construe this statute. (McKinney’s Cons Laws of NY, Book 1, Statutes §§92 [primary consideration of courts in construing statutes is to determine and give effect to legislature’s intent], 94 [statutory language generally construed by its natural and most obvious meaning and not using artificial or forced construction], 96 [in interpreting statute, basic consideration is general spirit and purpose underlying enactment], 98 [a] [all parts of statute must be harmonized with each other as well as with statute’s general intent as whole].) That the Health Code was adopted before the 1997 enactment of Agriculture and Markets Law § 107 (5) is of no moment as section 161.07 of the Health Code was repealed and recodified in 2010.
In prohibiting a municipality from enacting a program that is less stringent than the state program, and in light of the legislative intent to place the burden squarely on owners of dogs who have reportedly attacked a person or pet, the legislature thereby permits a municipality such as the City to adopt a comprehensive program consistent with that intent. Consequently, the legislature did not intend that an owner of a dog reported to have attacked a person or pet be afforded greater procedural rights under the Health Code than those set forth in section 123. As the Health Code incorporates standards that are as or more protective of public health and safety as those set forth in section 123, it duly comports with section 107 (5).
As section 107 (5) expressly permits New York City to enact its own rules governing dangerous dogs, petitioners fail to show that the Health Code is preempted by state law. While Fourth Amendment protections apply to administrative agencies *873 (Camara v Municipal Court of City & County of San Francisco, 387 US 523, 530-531 [1967]; Matter of Finn’s Liq. Shop v State Liq. Auth., 24 NY2d 647, 654 [1969]), and even though the Health Code provides that the preliminary determination as to whether a dog is dangerous is made not by a judge but by DOHMH, that inconsistency is countenanced by the proviso that the Health Code be as or more stringent than Agriculture and Markets Law § 123, and thus it provides no legal basis for the alleged preemption. (See New York State Socy. of Professional Engrs., Inc. v City of New York, 78 AD3d 477 [1st Dept 2010] [state law does not preempt City from regulating practice of engineering as state law specifically permits City to set and enforce its own building code], citing Executive Law § 383 [1] [c] [in cities with population over one million, existing municipal building and fire prevention codes “shall continue in full force and effect” unless it is determined that local code provisions are less stringent than state building code].) Moreover, DOHMH’s discretion in that regard is restricted by the requirement that it consider the circumstances surrounding both the incident and the dog’s prior history of biting and/or causing injury.
Absent any explanation of how Matter of Eberhardt v City of Yonkers (305 AD2d 501 [2d Dept 2003]) applies to this case, petitioners also fail to set forth a violation of section 107 (5) or a legal basis for their claim that section 123 governs here. That the Health Code may afford petitioners less procedural rights than those set forth in section 123 does not constitute proof that petitioners are deprived of due process. (See 20 NY Jur 2d, Constitutional Law § 423 [2016] [procedural due process under Constitution requires that person be afforded notice and opportunity to be heard before government deprives him or her of liberty or recognized property interest].)
Based on the foregoing, I need not address petitioners’ other contentions and arguments.
V. Conclusion
Accordingly, it is hereby ordered and adjudged, that the petition is denied in its entirety and the proceeding is dismissed.

 A shelter employee reported to the animal behaviorist that Ceasar had chewed a hole through his wire mesh cage at the shelter. Some of the other bases for the animal behaviorist’s opinion are as follows: In 2015 Ceasar attacked and killed a Maltese dog in that dog’s own yard; in 2010 Ceasar attacked a woman, resulting in seven lacerations in her left arm and hand that required treatment at a hospital; Ceasar killed the same woman’s cat on a prior occasion. Respondents offer no information concerning the sources of this information.